FILED

2014 Aug-12  PM 04:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| DEIDRA DAWN RIVERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:13-cv-468-TMP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

### Introduction

The plaintiff, Deidra Dawn Rivers, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for a period of disability and Disability Insurance Benefits ("DIB"). The denial of benefits was based not upon a denial of her claim that she is disabled, but on the determination that she did not become disabled until September 1, 2011, and that her insured status expired on December 31, 2009. Ms. Rivers timely pursued and exhausted her administrative remedies, and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).[1]

---

[1] The parties have consented to the exercise of dispositive jurisdiction by the

Ms. Rivers was 50 years old at the time of the Administrative Law Judge's ("ALJ") decision, and she has a high school education and one year of college.   (Tr. at 43-44.)   Her past work experience was working at a framing gallery where she framed, matted, and mounted artwork as part of an assembly line.   (Tr. at 44-45.) Ms. Rivers claims that she became disabled on April 1, 2004, due to chronic obstructive pulmonary disease (COPD), asthma, back problems, and knee problems. (Tr. at 43.)   In addition, Ms. Rivers is morbidly obese, has carpal tunnel syndrome, is diabetic, and has depression and anxiety.   (Tr. at 47-47).   She has more recently developed neck pain as a result of cervical disc degeneration.   (Tr. at 51).

When evaluating the disability of individuals over the age of 18, the regulations prescribe a five-step sequential evaluation process.   *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).   The first step requires a determination of whether the claimant is "doing substantial gainful activity."   20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   If she is, the claimant is not disabled and the evaluation stops.   *Id*.   If she is not, the Commissioner next considers the effect of all of the claimant's physical and mental impairments combined.   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   These

---

undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).   *See* Doc. 8.

impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled. *Id*. The decision depends upon the medical evidence in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971). If the claimant's impairments are not severe, the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments fall within this category, she will be found disabled without further consideration. *Id.* If they do not, a determination of the claimant's residual functional capacity ("RFC") will be made, and the analysis proceeds to the fourth step. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a).

The fourth step requires a determination of whether the claimant's impairments prevent her from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can still do her past relevant work, the claimant is not disabled and the evaluation stops. *Id.* If the

claimant cannot do past relevant work, then the analysis proceeds to the fifth step. *Id.* Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience, in order to determine if she can do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can do other work, the claimant is not disabled. *Id.* The burden of demonstrating that other jobs exist which the claimant can perform is on the Commissioner; and, once that burden is met, the claimant must prove her inability to perform those jobs in order to be found to be disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Ms. Rivers was not disabled prior to September 1, 2011, but became disabled on that date, and that her disability continued through the date of his decision. (Tr. at 20). He further found that the insured status requirements were not met. (Tr. at 20). The ALJ determined that Ms. Rivers met the insured status requirements of the Social Security Act through December 31, 2009. (Tr. at 22). He then determined that Ms. Rivers had not engaged in substantial gainful activity since the alleged onset of her disability. (Tr. at 22.) According to the ALJ, since the alleged onset date of disability, April 1, 2004, the claimant's asthma, COPD, morbid obesity, lumbar

degenerative disc disease, status post laminectomy (1998), mild left knee osteoarthritis (June 2008), mild right foot planer spur and degenerative changes (June 2009), mild right knee osteoarthritis (August 2010), and depression with mixed anxiety are considered "severe" based on the requirements set forth in the regulations.   (Tr. at 22.)   He found that, since September 1, 2011, the claimant had, in addition to the severe impairments listed above, severe impairments of "cervical and thoracic spine degenerative disc disease (2011) with right occipital neuralgia and migraine ...."  (Tr. at 22).    He found that Ms. Rivers' history of hypertension and hypotension, diabetes mellitus, carpal tunnel syndrome, status post carpal tunnel release on the right, status post left knee arthroscopy and status post lap-band surgery for obesity were non-severe impairments.  (Tr. at 23).   He further found that claimant's mental impairments did not meet the criteria of an applicable mental disorder listing.    (Tr. at 24.)

The ALJ did not find Ms. Rivers' statements concerning the intensity, persistence and limiting effects of her symptoms to be credible prior to September 1, 2011.   (Tr. at 27).[2]    He determined that, prior to September 1, 2011, she had the

---

[2]   The ALJ made this finding notwithstanding his statement at the close of the hearing that the claimant had given "very candid testimony in this case."   (Tr. at 77).

residual functional capacity to perform a full range of sedentary work, except that she must avoid concentrated exposure to extreme cold, heat, humidity, and pulmonary irritants, should have no exposure to unprotected heights or hazardous machinery, could occasionally stoop, kneel, crouch, crawl and climb stairs and ramps, but could not climb ladders, ropes, or scaffolds.   (Tr. at 24.)

Moving on to the fourth step of the analysis, the ALJ concluded that Ms. Rivers is not is able to perform her past relevant work, but that, prior to September 1, 2011, as the vocational expert testified, there were a significant number of jobs in the national economy that claimant could have performed.  (Tr. at 33).  Finally, the ALJ concluded that since September 1, 2011, Ms. Rivers has been disabled.   (Tr. at 34).   Because the date of onset determined by the ALJ was beyond the claimant's date of insured status, Ms. Rivers was found to be ineligible for DIB.


## Standard of Review

This Court's role in reviewing claims brought under the Social Security Act is a narrow one.   The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied.  *See*

*Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence is "more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F3d 1155, 1158 (11th Cir. 2004), quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997). The Court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Id.* "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this Court finds that the evidence preponderates against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for review of claims] it is

imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## Discussion

Ms. Rivers asserts that the ALJ's decision should be reversed and remanded because the ALJ failed to properly consider the evidence relating to the severity of her conditions and symptoms prior to September 1, 2011. (Doc. 11, pp. 12-21). In order to be eligible for benefits under Title II, the claimant must have demonstrated that she was disabled on or before the last date on which she was insured – December 31, 2009. *See Miller v. Commission of Soc. Sec. Admin.*, 280 Fed. Appx. 870, 871 (11th Cir. 2008), citing *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 1990); see also 42 U.S.C. § 423(a)(1)(A). To establish the existence of the disability, the claimant must have shown that her impairment or combination of impairments meet or exceed the requirements of a listed impairment from Appendix 1 of Subpart P, 20 C.F.R. § 404.

The ALJ supported his finding that Ms. Rivers became disabled on September 1, 2011, based on the date that imaging test results first showed the degenerative disc disease and spondylosis in the claimant's cervical spine.  It is clear, however, that Ms. Rivers had been experiencing lower back pain before her laminectomy in 1998, and that the pain had not resolved before 2009.   She went to the emergency room in June of 2007 and again in April 2008 complaining of severe back pain (Exh. 17F, pp. 710-715, 678-679), and she reported back pain as one of her chief complaints even when being examined for acute symptoms of pneumonia. (Exh. 17F, p. 666).  In addition, the "unremarkable" lumbar spine imaging results upon which the ALJ relied apparently were only x-rays (Exh. 17F, p. 715), and there is no indication that MRIs or more sensitive imaging tests (like the MRI that revealed the cervical spine abnormalities) had ever been ordered.   (Exh. 17F, p. 745).

Finally, while the ALJ interpreted the pain from the cervical discs to be the additional objective medical evidence that put the claimant "over the edge" into disability, his conclusion that the cervical issues were the tipping point is not supported by substantial evidence.   In fact, the conclusion is contrary to the claimant's testimony.   Consider the following exchange:

Q:      So your cervical and upper thoracic area would be more problematic for you now [than your lower back problems]. Would that be a correct statement?

A:      No, sir.   I think, I mean my lower back is a problem but I know what I can do from that.   I know, you know, mostly if I, if I stand up too long or if I sit in one position too long, I know that I'm going to pay for that the next day or two.   But as far as the cervical and the, I'm having injections on my neck right now and I'm still having to do the, the pain pills and, you know, different things for that.   Sometimes ice helps, sometimes heat helps. But as far as the middle back, the I don't know [what] you call it, I don't know what it's called, in the middle.

Q:      Lumbar.

A:      I'm sorry?

Q:      Lumbar.

A:      Lumbar.

Q:      Lumbar.

A:      The lumbar is, you know, the lower part is more, I don't know, it's, I've got used to that I guess you can say.   I've got used to what I can do and what I can't do.   But it's still a problem.

(Tr. at 51.)


The claimant also clearly testified that she was missing two to three days per month

when she was working in 2004 because of her chronic pain:

10

Q:     Now on your worst day, when there's pain –

A:     Yeah.

Q:     – where would that pain scale fall at?

A:     I'd say anywhere from an eight to a ten to a seven.   I never get, like on my bad days, where I'm going to bed, it is, it is a bad, bad day.

Q:     Now, you testified a little earlier that you have bad days wherein you pretty much stay in the bed a while and just get up and do what you absolutely have to do or what's necessary to do.

A:     Right.

Q:     And I believe you indicated that you have, what, three days, I believe that was you testimony bad days –

A:     During a month.

Q:     – in a week – during a month?

A:     During a month, yes.

Q:     *Now that was fairly consistent with your, with the way pain symptomology has run since you left or actually in this case maybe before you left your last job back in 2004?*

A:     *Yeah, I would –*

Q:     *You had two or three bad days a month where you just couldn't work because of pain?*

11

A:      *Yes, sir.*

Q:      Okay.   And does that relate to your earlier testimony that you were missing quite a few number of days on average prior to you leaving that job [Paragon]?

A:      *Well, that and with the pneumonia, with the respiratory problems, yes.*

Q:      Okay.   Now, how many days on average per month prior to you leaving that job in the, say, six months up until April of 2004, on average how many days a month of work were you missing ---

A:      Days a month?

Q:      --- if you recall?

A:      Oh, I really can't recall.   I would, I really can't recall how many but I know that I was, I was being called into the office, you know, for, missing, for my absenteeism.

Q:      Okay.

A:      I wish I could tell you how many days, but I can't, I really can't remember.   I know it was quite a few.

(Tr. at 66-67) (italics added).   The claimant further testified that the COPD and asthma, even without the chronic pain, caused her to be unable to work:

Q:      Well, when you were still working for Paragon, were you doing the nebulizer treatments at that time?

12

> A:     Not during work, no.   If I had a bad day or if I had a bad spell, or
> if I, sometimes if I get a sinus infection, it would get down into
> my lungs, you know, drain down into my lungs and I would have
> to use them at that time, but that's when I was, I would be out of
> work.   I couldn't use [the nebulizer treatments], you know, I
> couldn't use them at work.

> Q:     When you, when you left Paragon back in 2004 based on your
> earlier testimony, the implication was that you left because of all
> your chronic pain issues.   If it weren't for the chronic pain,
> could you have continued to work with your COPD and asthma
> problems?

> A:     I was out of work quite a bit with that.   I would say no.

(Tr. at 54).    The ALJ specifically asked Ms. Rivers how many days she was

missing from work at the time that she left her job, and she stated that she couldn't

recall the exact number of days she missed per month but that it was "quite a few."

(Tr. at 67).   This testimony takes on importance because the vocational expert later

testified that a hypothetical individual with absences of "two or more days of work

per month due to chronic recurrent symptomatology" would be precluded from

"either past work or other work."   (Tr. at 75).   There was no evidence submitted

that called into question the claimant's testimony that, in 2004, she was missing

more than two days of work per month because of her chronic recurrent back pain.

The phrase "quite a few," while lacking specificity, logically means more than two, which is further bolstered by her testimony that her employer had called her into the office to discuss her many absences.   (Tr. at 67).

Ms. Rivers further testified that she had additional absences attributable to the shortness of breath caused by asthma and COPD.   The asthma and COPD required the use of treatments by a nebulizer and a rescue inhaler.   None of the hypothetical questions asked of the vocational expert addressed the ability to work given claimant's need to undergo nebulizer treatments that required special equipment and took about 15 minutes each, three times a day, and the frequent use of a rescue inhaler, after which she required several minutes of rest in order to regain her breath. According to the testimony that was elicited from the vocational expert, the level of absenteeism that was described by the claimant, even without considering the need for breaks to use her nebulizer or rescue inhaler, would have rendered her unable to perform any work even before she voluntarily left her job in 2004.[3]

---

[3]      Ms. Rivers alluded to the possibility that her employer may have been considering firing her in that she testified that she was called in to discuss her absenteeism.   The fact that she was not fired – perhaps because her employer was sympathetic or perhaps because Ms. Rivers was a good worker when she was able to be at work – should not diminish her right to benefits if she was disabled under the appropriate regulations.   Otherwise, claimants with less flexible employers, or who simply don't work as hard to try to carry their workload, have an advantage making them more likely to receive Social Security benefits, thus incentivizing a lack of effort.

The record further established that, while the claimant's impairments worsened because of the cervical disc disease that was not verified by objective medical evidence until September 2011, her obesity decreased after she lost 100 pounds.  This fact was apparently not considered by the ALJ in establishing an onset date linked solely to the cervical disc images.  To the contrary, the ALJ's assessment did not take into account that Ms. Rivers weighed more than 300 pounds in 2004, and that she made efforts to reduce her weight.   The ALJ did not state that he took into consideration that the claimant delayed seeking benefits because she remained optimistic that her weight loss and medical treatments would render her able to return to the workforce.   The evidence demonstrated not that claimant failed to apply for benefits prior to 2010 because she was not disabled prior to 2010, but that she delayed her application because she believed that she might be able to "get better and be able to return to work."   (Tr. at 26).

The ALJ failed to consider the exacerbating effect claimant's obesity had on her other medical conditions, including her COPD, lower back pain, and knee pain. Throughout claimant's medical records, various physicians described her as "morbidly" obese.   Indeed, in 2010 she underwent lap-band surgery to lose weight, and has successfully lost 100 pounds since.   But this does not change the

assessment whether, prior to that time, going back to 2004, her obesity so aggravated her COPD, back pain, and knee pain that she was rendered disabled.   Obesity, either alone or in combination with other medical ailments, can result in disability and must be considered by the ALJ in the assessment of the claimant's ability to work. "Social Security Regulation 02–1p provides that obesity shall be considered when determining if (1) a claimant has a medically determinable impairment, (2) the impairment is severe, (3) the impairment meets or equals the requirements of a listed impairment, and (4) the impairment bars claimant 'from doing past relevant work and other work that exists in significant numbers in the national economy.'"   *Lewis v. Commissioner of Social Security*, 487 F. App'x 481, 483 (11th Cir. 2012); *see also Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984) ("[W]e hold that where… a claimant has alleged a multitude of impairments, a claim for social security benefits based on disability may lie even though none of the impairments, considered individually, is disabling.   In such instances, it is the duty of the administrative law judge to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled.").

In this case, it is plain that morbid obesity affected and worsened many of claimant's medical impairments, most particularly her COPD.  She testified that she had to use a nebulizer frequently to regain her breath after attempting to walk.  Indeed, the "Exercise Journals" pointed out by the ALJ simply confirm that walking exacerbated her COPD to point of requiring the use of a rescue inhaler three times during a 45-minute walk.  Claimant suffered from COPD, asthma, and morbid obesity well before December 31, 2009.  In November 2008, claimant was hospitalized for five days with serious respiratory issues.  Upon her discharge, a treating physician wrote that "her morbid obesity could be causing hypoventilation syndrome…," clearly linking her obesity to her COPD and shortness of breath.  (Exh. 2F, p. 227).  The ALJ did not attempt to explain how this event was not the tipping point at which claimant's disability became clear.  The combination of her COPD and asthma, exacerbated by her obesity (which caused even more "hypoventilation" or shortness of breath), is plainly consistent with her testimony that she was frequently required nebulizer treatments to regain her breath.

It is also telling that the ALJ, at the end of the hearing, thanked Ms. Rivers for "what I perceive to be your very candid testimony in this case."  (Tr. at 77).   This statement contradicts the ALJ's ultimate decision regarding Ms. Rivers' credibility.

17

The ALJ determined that Ms. Rivers' descriptions of her abilities were not credible prior to September 2011, but were credible regarding her abilities after that date. No clear reasons are given for this shifting opinion of her credibility, however, the ALJ seemed to rely heavily on the "Exercise Journals" contained in Exhibit 4F.   (Tr. at 292-315).   The ALJ noted that Ms. Rivers had been walking, swimming, and climbing bleachers in 2010.   These "journals" were forms required by Ms. Rivers' doctor as she prepared for lap-band surgery in 2010.   The documents referred to, however, indicate only what Ms. Rivers reported her activities for *only* any five days per month during the months leading to the surgery, and while most of the entries indicated "walking," "stretching," and "swimming," almost none of the entries specified a duration, distance, or level of exertion.   (*See* Exhibit 4F, p. 296, 301, 306, 311, 314).[4]   The few that specify time or distance indicate only: "10 minutes" of walking on a treadmill, (Exh. 4F, p. 296); walking "probably 1 mile," (Exh. 4F, p. 306); walking 30 minutes with "difficulty," which required using a rescue inhaler; and walking 45 minutes, having to stop three times to use an inhaler (Exh. 4F, p.

---

[4]      Ms. Rivers filled out the forms from March 2009 until July 2009, the five months leading up to her lap-band surgery.   She told the ALJ that she could not walk very far, but that she could swim, because it was less of a problem for her back pain and her respiratory problems.   (Tr. at 68).

311).   The "Exercise Journal," despite its title, could not fairly be considered to be a general description of the claimant's daily activities.   The ALJ's conclusion that the claimant was "much more active than alleged" and could have performed sedentary work prior to 2011 is not supported by substantial evidence.   (Tr. at 28).   If anything, this evidence shows how claimant's COPD and obesity limited her ability to work in any meaningful sense.

The ALJ failed to consider the claimant's testimony that her COPD required her to miss more than two days of work a month.   Her treating physician, Dr. Kopyta, expressed the opinion in June 2012 that claimant's medical conditions, including COPD and obesity, would require her to miss more than three days of work each month and would cause claimant to be distracted from job tasks more than two hours out of each eight-hour work day.   (Exh. 14B, pp. 133-134).   This is consistent with claimant's testimony that even when she was attempting to work in 2004, her respiratory problems caused her to miss "quite a few" days of work, to the point that her employer called her into the office to discuss her absences.   The importance of this evidence is found in the testimony of the vocational expert, David Head, who testified that more than two absences per month would make a hypothetical person like claimant unemployable.   (Tr. at 75).

The Court is aware that opinions such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions,... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Even so, the court must determine whether the ALJ's determination is based upon substantial evidence, not a mere scintilla of evidence. 395 F.3d at 1210. Credibility determinations cannot be based on "an intangible or intuitive notion," but must be "grounded in the evidence and articulated in the determination or decision." Soc. Sec. R. 96-7p, 1996 WL 374186 at *4.

Staying as active as possible, especially when the activity is linked to treatment designed to improve the claimant's disabling condition – in this case obesity – is not inconsistent with a finding of disability. *See, e.g.*, *Reddick v. Chater*, 157 F.3d 715,724 (9th Cir. 1998). Moreover, Ms. Rivers' record of attempting to walk, stretch, and swim – with very limited success – in order to

qualify for the lap-band surgery is not inconsistent with her testimony about chronic pain and breathing difficulties.

Finally, the ALJ's credibility determinations and opinions regarding disability are due deference, but only if they are based upon a consideration of "the individual's statements about symptoms with the rest of the relevant evidence in the case," and reflect the record as a whole.   Soc. Sec. R. 96-7p, 1996 WL 374186 at *1.   In this case, the record as a whole demonstrates that the claimant consistently complained of severe back pain over many years, and that none of the health professionals who have examined her discounted her subjective complaints of pain.   The duration, frequency and intensity of the alleged pain are factors that must be considered pursuant to 20 C.F.R. §§ 404.1529 and 416.929.   The ALJ's credibility determination must also "be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   Soc. Sec. R. 96-7p, 1996 WL 374186 at *4.   An ALJ's failure to explicitly articulate the reasons for discrediting testimony requires that "as a matter of law, the testimony be accepted as true." *Snyder v. Commission of Soc. Sec.*, 330 Fed. Appx. 843, 848 (11th Cir. 2009), citing *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).   Another judge within this

district has noted that where an ALJ "either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if his reasons are not supported by substantial evidence, the plaintiff's testimony regarding pain or other subjective symptoms (such as fatigue) must be accepted as true." *Merritt v. Barnhart*, 430 F. Supp. 2d 1245, 1249 (N.D. Ala. 2006), citing *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). The Eleventh Circuit Court of Appeals has recognized that a condition that is not "easily seen or examined" should not be discounted for a lack of objective evidence, noting that "in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Cavarra v. Astrue*, 393 Fed. Appx. 612, 615-16 (11th Cir. 2010). In *Cavarra*, the ALJ's credibility determination was found to be unsupported where he "completely discounted" the claimant's subjective complaints of pain. 393 Fed. Appx. at 616. If an ALJ chooses to discredit testimony regarding pain, he must "articulate explicit adequate reasons for doing so." 393 Fed. Appx. at 615, citing *Foote*, 67 F.3d at 1561-62.

The ALJ failed to support by substantial evidence his finding that the claimant could perform sedentary work prior until September 1, 2011. Accordingly, the matter is due to be reversed and remanded for a hearing that properly considers the

effects of the claimant's asthma, COPD, back pain, obesity, and the frequency of absences caused by her medical conditions prior to September 1, 2011.

## Conclusion

Upon review of the administrative record, and considering all of Ms. Rivers' arguments, the undersigned Magistrate Judge finds the Commissioner's decision regarding the date of onset of disability is not supported by substantial evidence and is not in accord with the applicable law.   By separate judgment, the court will reverse the Commissioner's denial of disability benefits and remand case for a supplemental hearing to determine the onset date of the claimant's disability consistent with this opinion.

DATED the 12th day of August, 2014.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE